IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARCIN KEGEL** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  26-1213** |
| | : | |
| **MICHAEL ROSE, KRISTI NOEM,** | : | |
| **PAMELA BONDI, TODD LYONS** | : | |

## MEMORANDUM

**MURPHY, J.**                                                                          **April 15, 2026**

Habeas petitioner Mr. Kegel overstayed his visa and was detained by ICE on his way

home from vacationing in the Virgin Islands.  He requested a hearing in front of an immigration

judge, who ordered his release on $5,000 bond as well as the following conditions: no arrests, no

harmful contact, no driving without a valid driver's license, and no illegal drugs.  Apparently

unhappy with the results, ICE, rather than appeal, unilaterally imposed additional conditions: Mr.

Kegel had to wear an ankle monitor (later replaced by an app tracking his location); limit his

travel to Pennsylvania, New Jersey, and Delaware; and present for an in-person check-in every

eight weeks.  Mr. Kegel now challenges ICE's authority to impose these additional restraints on

his liberty.  The government counters that (1) we don't have jurisdiction to consider this petition

because Mr. Kegel is not in custody and (2) ICE acted within its statutory and regulatory

authority.  We reject the government's arguments and grant Mr. Kegel's petition.  ICE's order

requiring additional restrictions beyond what the immigration judge determined is vacated.

## I.      FACTUAL BACKGROUND

Petitioner Marcin Kegel is a Polish citizen who was admitted to the United States on

August 12, 2005, on a B2 visitor visa.  DI 8-1 at 2.[1]  The terms of his visa allowed him to remain

---

[1] We adopt the sequential pagination supplied by the CM/ECF docketing system.

in the United States until February 11, 2006, which Mr. Kegel has significantly overstayed. *Id.* Mr. Kegel is self-employed in the construction business, and resides in Pennsylvania with his wife, who he married last year and who is a U.S. citizen. *Id.;* DI 1 at ¶ 30; DI 13 at 14, ¶ 1. In January 2026, Mr. Kegel's wife filed a form I-130 Petition for Alien Relative to begin the process of obtaining legal permanent residency for Mr. Kegel. DI 1 at ¶ 30.

On January 2, 2026, Mr. Kegel was returning home from vacation with his wife and family from the U.S. Virgin Islands, when he was questioned by U.S. immigration officials at the airport in St. Croix. *Id.* at ¶ 31. The immigration officials determined that Mr. Kegel did not have lawful status in the United States and arrested him, charging him under 8 U.S.C. § 1227(a)(1)(B) as a nonimmigrant who allegedly violated the terms of his visa. DI 8-1 at 2; *see also* DI 14-1. The Department of Homeland Security (DHS) also issued Mr. Kegel a Notice to Appear (NTA), formally commencing his removal proceedings.[2] DI 8-1 at 2.

Immigration officials then detained Mr. Kegel under 8 U.S.C. § 1226 and transported him to a detention facility in Puerto Rico.[3] DI 1 at ¶ 32. Mr. Kegel was then transferred to Florida Soft Side South and then to the Miami Krome Detention Center. *Id.* During this time, Mr. Kegel requested a custody redetermination hearing before an immigration judge in accordance with § 1226(a) and received a hearing data of January 26, 2026. *Id.* In advance of the hearing, Mr. Kegel filed evidence in support of his request, including letters of support, documentation

---

[2] An NTA "informs the alien of, among other things, the charges against him and the time and place of the hearing at which an immigration judge will determine whether the alien is to be removed." *Johnson v. Guzman Chavez*, 594 U.S. 523, 527 (2021); *see also* 8 U.S.C. § 1229(a).

[3] § 1226 provides DHS with discretion to detain or release an alien "pending a decision on whether the alien is to be removed from the United States." We dive deeper into this statute and its accompanying regulations in our discussion section.

showing his eligibility for relief, and a brief in support of his eligibility for bond. *Id.* at ¶ 34.

Immigration Judge (IJ) Jorge Pereira presided over Mr. Kegel's bond hearing. DI 13 at 6. Mr. Kegel and his attorney were present, as was counsel from DHS. *Id.* During the hearing, IJ Pereira confirmed that Mr. Kegel had a pending I-130 as well as no criminal history in the U.S. or otherwise, and then ordered Mr. Kegel released on a $5,000 bond. DI 13 at 3-4, 8. IJ Pereira's order also included the following conditions of release: "no arrests, no harmful contact, no driving without a valid driver's license, [and] no illegal drugs." *Id.* IJ Periera remarked that these conditions "should be enough to ensure that [Mr. Kegel] appear[s] at all of your immigration court hearings." DI 13 at 8. IJ Pereira then asked both the government and Mr. Kegel's counsel if they would like to reserve their right to appeal the amount of the bond or the conditions of release to the Board of Immigration Appeals (BIA). Mr. Kegel waived his right to appeal while the government reserved its rights. *Id.* at 4, 13. IJ Pereira set a due date of February 25, 2026 for the government to appeal, *id.* at 9, which the government did not do. *See* DI 13 at 12.

On January 27, 2026, Mr. Kegel's wife paid Mr. Kegel's bond and traveled to Florida to retrieve him from detention. DI 1 at ¶ 36. But upon his release, ICE attached an ankle monitor to Mr. Kegel and enrolled him in the Alternatives to Detention (ATD), Intensive Supervision Appearance Program (ISAP). *Id.* As part of his enrollment, ICE instructed Mr. Kegel to report to the King of Prussia ISAP Office on January 29, 2026, where he was told he had to (1) wear the ankle monitor; (2) only travel within Pennsylvania, New Jersey, and Delaware; and (3) report to the ISAP office every eight weeks for check-ins. DI 1 at ¶ 38; DI 14-2. There is no evidence in the record that ICE provided Mr. Kegel with notice of these additional conditions of release or

3

afforded him an opportunity to challenge them.  ICE also told Mr. Kegel that agents may come to his house for random visits.  DI 13 at 14, ¶ 3.

On February 25, 2026, Mr. Kegel filed a petition for a writ of habeas corpus, challenging ICE's authority to impose these additional restraints on his liberty that went beyond the IJ's order.  DI 1.  Specifically, Mr. Kegel asserts the following claims: (1) two violations of his Fifth Amendment rights, one for substantive due process and the other for procedural due process; (2) three violations of the Administrative Procedures Act (APA) under 5 U.S.C. § 706(2), one for agency action not in accordance with the law, another for arbitrary and capricious conduct, and a third for conduct in excess of statutory authority; (3) a violation of the *Accardi* doctrine established in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); and (4) ultra vires action.  *Id.* at ¶¶ 93-117.  Mr. Kegel asks us to release him from the supervision of ISAP and set aside the restraints imposed on him from the ISAP program.  *Id.* at 28-29.

Following Mr. Kegel's filing of his writ, the government tried to resolve the issue without court intervention by removing Mr. Kegel's ankle monitor and requiring him instead to download an app called SmartLINK on his phone.  DI 13 at 14, ¶ 5; DI 8-2.  As part of his participation in SmartLINK, Mr. Kegel must take a photo through the app every Monday between 10 AM and 12 PM in front of a white wall and consent to random check-ins through the app at any time.  DI 13 at 15, ¶¶ 9, 14; DI 8-2.  Failure to comply with these policies could result in Mr. Kegel's return to detention.  DI 8-2.  Furthermore, while Mr. Kegel says that ICE told him they would not live-track his location, the app still offers this capability.  DI 13 at 15-16, ¶ 15; *see also* ICE, Alternatives to Detention Frequently Asked Questions, https://www.ice.gov/atd-faq (last updated Mar. 10, 2025).  In fact, when Mr. Kegel recently drove into New York (for

which he had received one-time permission from ICE), the app immediately sent Mr. Kegel a text message that he had traveled outside the permitted radius of Pennsylvania, New Jersey, and Delaware.  DI 13 at 15-16, ¶ 15.  Mr. Kegel has decided to move forward with his petition.

The government opposes Mr. Kegel's petition.  They argue (1) we lack jurisdiction to consider Mr. Kegel's petition because Mr. Kegel is not "in custody" for purposes of habeas relief and (2) even if we did have jurisdiction, ICE has the statutory and regulatory authority to impose conditions of release through the ISAP program.  DI 8 at 4.

## II.    DISCUSSION

### A.  Mr. Kegel is in custody for purposes of habeas relief

As a federal district court, we can grant habeas relief to a petitioner who "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).  "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest."  *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001).  This includes challenges to "detentions based on errors of law, including the erroneous application or interpretation of statutes" in addition to constitutional violations.  *Id*. at 302-303.

Relevant here, "the use of habeas corpus has not been restricted to situations in which the applicant is in actual, physical custody."  *Jones v. Cunningham*, 371 U.S. 236, 239 (1963).  Rather, "there are other restraints on a man's liberty, restraints not shared by the public generally, which have been thought sufficient in the English-speaking world to support the issuance of habeas corpus."  *Id.* at 240.  In *Jones* — the first watershed case on this issue — the Supreme Court confronted whether a state prisoner who had been convicted in Virginia state court, served time in prison, and now was on parole was still in custody for purposes of § 2241

jurisdiction.  Mr. Jones's parole order specifically "placed petitioner in the custody and control of the Parole Board and directed him to live with his aunt and uncle in LaFayette, Georgia." *Id.* at 237 (citation modified).  It further "provided that his parole was subject to revocation or modification at any time . . .  and that petitioner could be arrested and returned to prison for cause." *Id.*  Mr. Jones was additionally "required to obtain the permission of his parole officer to leave the community, to change residence, []to own or operate a motor vehicle[,] . . . to make monthly reports to his parole officer, to permit the officer to visit his home or place of employment at any time, and to follow the officer's instructions and advice." *Id.*  In considering all these conditions, the court reasoned that Mr. Jones's terms of release "significantly restrain[ed] petitioner's liberty to do those things which in this country free men [were] entitled to do" and thus Mr. Jones was "in the custody of the members of the Virginia Parole Board within the meaning of the habeas corpus statute." *Id.* at 243 (citation modified).

Ten years after *Jones*, the Supreme Court in *Hensley v. Mun. Ct., San Jose Milpitas Jud. Dist., Santa Clara Cnty., California*, 411 U.S. 345 (1973) extended habeas jurisdiction to a petitioner released on his own recognizance pending appeal of his state court conviction.  The petitioner's conditions of release were less restrictive than those in *Jones*, but the petitioner was still required to "appear at all times and places as ordered by any court or magistrate of competent jurisdiction." *Id.* at 351 (citation modified).  This, the Court reasoned, made him "subject to restraints not shared by the public generally" and thus was sufficient to render him in custody. *Id.* (citation modified).

More recently, the Third Circuit confronted the limits of habeas jurisdiction in three cases.  First, in *Barry v. Bergen Cnty. Prob. Dep't*, 128 F.3d 152 (3d Cir. 1997), the Third

Circuit concluded that petitioner's court-mandated community service of 500 hours over three years as part of his judgment of conviction was sufficient to render him in custody. The Third Circuit acknowledged that "the State did not monitor or restrict [petitioner's] every act" and that he was "afforded a certain amount of flexibility to schedule when [he] would complete [his] respective obligations" but nevertheless "an individual who is required to be in a certain place. . . is clearly subject to restraints on his liberty not shared by the public generally." *Id.* at 160-61.

Then in *United States v. Ross*, 801 F.3d 374 (3d Cir. 2015) the Third Circuit held that petitioner's monetary penalty — a $100 special assessment — associated with his federal conviction did not render him in custody. In reaching this conclusion, the Third Circuit looked at past precedents including *Jones* and *Hensley* and set forth a three-part test for deciding what constitutes custody: the restraints on the petitioner must be (1) severe, (2) immediate (*i.e.,* not speculative), and (3) not shared by the public generally. *Id.* at 379. Applying this test, the Third Circuit reasoned that a monetary penalty associated with a conviction is not sufficiently severe because a severe restraint physically restricts a person's movement. *Id.* There, the $100 special assessment did not limit petitioner's mobility and thus he was not in custody. *Id.* at 380.

Finally, in *Piasecki v. Ct. of Common Pleas, Bucks Cnty., PA*, 917 F.3d 161 (3d Cir. 2019), the Third Circuit held that a petitioner who was subject to registration requirements under Pennsylvania's Sex Offender Registration and Notification Act (SORNA) was in custody. As mandated under SORNA, the petitioner had to register in-person with the state police every three months for the rest of his life and record personal changes such as moving residences, beginning a new job, and changing his phone number or email address. *Id.* at 164-65. These conditions, the Third Circuit reasoned, satisfied the three-part test enunciated in *Ross.* First, petitioner's

7

restraints were severe because "[u]nlike the special assessment considered in *Ross*, these

restraints compelled [petitioner's] physical presence at a specific location and severely

conditioned his freedom of movement." *Id.* at 171.  Second, the restrictions were "immediate" in

that the petitioner was subject to all the SORNA requirements when he filed the petition at issue,

and third, the restrictions "were obviously not shared by the public generally." *Id.* (citation

modified).  Thus, the petitioner was in custody.

Turning to Mr. Kegel's situation, neither the Supreme Court nor the Third Circuit have

addressed whether a noncitizen released on conditions while his removal proceedings are

pending is considered in custody.  But many district courts have accepted habeas jurisdiction in

very similar circumstances.  For example, in *Orellana Juarez v. Moniz*, 788 F. Supp. 3d 61 (D.

Mass. 2025), Judge Joun held that a petitioner was sufficiently in custody who was placed in the

ISAP program after being released from a detention facility.  Specifically, the petitioner was

required to wear a GPS device on his ankle, regularly report to ICE for check-ins, allow ICE to

enter his residence at home visits, abide by a curfew of 10PM, and not travel outside of

Massachusetts, New Hampshire, Rhode Island, and Connecticut.  *Id.* at 68.  In considering these

requirements, Judge Joun reasoned that "while petitioner is free in the sense that he is not behind

prison walls, [petitioner] is subject to custody sufficient for habeas relief." *Id.* (citation

modified).

Other district courts have reached analogous determinations.  *See e.g. Harrington v.

Albarran*, No. 26-CV-01889, 2026 WL 800113, at *4 (N.D. Cal. Mar. 23, 2026) (finding a

petitioner under ISAP supervision was in custody because "[h]e is restricted from leaving a

radius within Northern California and must wear an ankle monitor around the clock"); *A.B.D. v.*

*Wamsley*, No. 6:25-CV-02014, 2026 WL 178306, at *8 (D. Or. Jan. 22, 2026) (finding petitioner under ISAP supervision was in custody because "intensive supervision and monitoring measures, which carry with them the potential for future adverse consequences for noncompliance . . . subjects [petitioner] to significant restraints that are not shared by the public generally") (citation modified); *Khabazha v. United States Immigr. & Customs Enf't*, No. 25-CV-5279, 2025 WL 3281514, at *3 (S.D.N.Y. Nov. 25, 2025) (finding that a petitioner released from ICE detention who had to "wear an ankle monitor at all times and check in at regular intervals . . . render him in custody for purposes of his habeas petition") (citation modified); *Batz Barreno v. Baltasar*, No. 25-CV-03017-GPG-TPO, 2026 WL 120253, at *2 (D. Colo. Jan. 15, 2026) (finding that petitioner who was mandated by ICE to wear an ankle monitor and comply with various reporting requirements "remains in custody through the conditions of release imposed by ICE").

The foregoing authority leads us to conclude that Mr. Kegel is in custody for purposes of § 2241 habeas jurisdiction because his restraints satisfy the requirements set forth in *Ross*: they are (1) severe, (2) immediate, and (3) not shared by the public generally. *See da Silva v. LaForge*, No. 25-CV-17095, 2026 WL 45165, at *2 (D.N.J. Jan. 7, 2026) (applying the *Ross* test to a petitioner under ISAP restrictions). Mr. Kegel's release conditions are severe because they restrain his movement. *See Piasecki*, 917 F.3d at 170. Specifically, he cannot leave Pennsylvania, New Jersey, and Delaware, and must report to the ISAP office in King of Prussia every 8 weeks. Additionally, Mr. Kegel is required to take a photograph with the SmartLINK app every Monday between 10 AM and 12 PM in front of a white wall, and also consent to random location check-ins through SmartLINK. Failure to comply with these policies could result in petitioner's return to detention. These conditions, taken together, are more restrictive

than the community service requirement in *Barry* (where the Third Circuit still accepted habeas jurisdiction) and in line with the conditions imposed on the petitioner in *Piasecki.* The other two *Ross* factors are easily met: Mr. Kegel's restraints are immediate because he is subject to these restraints now, and plainly these restrictions are not shared by the public generally.

The government advances several counterarguments, all of which are unavailing. First, the government argues that because ICE deescalated petitioner's participation in ISAP by removing his ankle bracelet and enrolling him in SmartLINK, he is no longer in custody. Specifically, the government notes that the SmartLINK app, unlike an ankle monitor, does not continuously monitor petitioner's location, but rather obtains a single GPS point to monitor participant compliance at the time of a login or scheduled check-in. This argument is unpersuasive. The Third Circuit held in *Barry* that a petitioner does not have to be supervised on a continuous basis to be in custody. *Barry*, 128 F.3d at 161. Rather, all that is required is that ICE perform an "oversight function" which the SmartLINK check-in system certainly does. *Id.*; *see also Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 895 (2d Cir. 1996) ("While supervision (or harassment) by tribal officials or others acting on their behalf may be sporadic, that only makes it all the more pernicious . . . [because] the petitioners have no ability to predict if, when, or how their sentences will be executed.") (citation modified). It may also be noted that the government admits that SmartLINK is technically capable of continuous location monitoring, and thus ICE could elect to use this feature even if it has not done so yet.

Beyond Mr. Kegel's obligation to use SmartLINK, he is subject to still further requirements rendering him in custody: he must abide by travel restrictions and report to ISAP headquarters every 8 weeks. *See Piasecki,* 917 F.3d at 161 ("The state's ability to compel a

10

petitioner's attendance weighs heavily in favor of concluding that the petitioner was in custody.")  The government tries to minimize Mr. Kegel's geographic restrictions by pointing out that Mr. Kegel can request approval from ICE to travel outside of Pennsylvania, New Jersey, and Delaware.  But that is the point.  The very fact that Mr. Kegel must request permission to travel is a "restraint not shared by the public generally," *Jones*, 371 U.S. at 376 and thus indicative of his custodial status.[4]

Finally, the government argues that petitioner's restraints are temporary in nature because many ISAP participants are eventually terminated from the program.  Maybe so.  But we can deal only with the facts in front of us today, and today petitioner is in custody.  Therefore, we have jurisdiction to evaluate Mr. Kegel's habeas petition on that basis.

B.  **ICE exceeded its statutory and regulatory powers under the Immigration and Nationality Act (INA)**

In considering the merits of Mr. Kegel's habeas petition, we begin with the relevant statutory and regulatory provisions: 8 U.S.C. § 1226 controls DHS's ability to apprehend and detain aliens while the aliens' removal proceedings are pending.  "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."  The statute then permits the Attorney General the choice to either (1) "continue to detain the arrested alien" while the removal process plays out or (2) "release the alien on . . . bond of at least $1,500 with security approved by, and containing

---

[4] We also note that in the one case the government cites for the proposition that a noncitizen's participation in ISAP does not render him in custody, there was no mention that the noncitizen was restricted to a geographic radius as Mr. Kegel is here. *See J.P. v. Santacruz*, No. 8:25-CV-01640-FWS-JC, 2025 WL 2633198 (C.D. Cal. Aug. 27, 2025).

conditions prescribed by, the Attorney General." *Id.*

The Attorney General has delegated the authority to make these custody determinations

to immigration judges under the implementing regulations. *See* 8 C.F.R. §§ 1003.19, 1236.1;

*Huanga v. Decker*, 599 F. Supp. 3d 131, 138 (S.D.N.Y. 2022). The key regulations structuring

this process are 8 C.F.R. § 1236.1(d)(1) & (d)(3) which provide:

> (d) Appeals from custody decisions—
>
> > (1) Application to immigration judge. After an initial custody determination by [ICE], including the setting of a bond, the [alien] may, at any time before an order under 8 CFR part 1240 becomes final[5], request amelioration of the conditions under which he or she may be released. Prior to such final order, and except as otherwise provided in this chapter, the immigration judge is authorized to exercise the authority in [8 U.S.C. § 1226] . . . to detain the alien in custody, release the alien, and determine the amount of bond, if any, under which the [alien] may be released, as provided in § 1003.19 of this chapter. If the alien has been released from custody, an application for amelioration of the terms of release must be filed within 7 days of release.
> >
> > \*\*\*
> >
> > (3) Appeal to the Board of Immigration Appeals. An appeal relating to bond and custody determinations may be filed to the Board of Immigration Appeals in the following circumstances:
> >
> > (i) In accordance with § 1003.38 of this chapter, the alien or the Service may appeal the decision of an immigration judge pursuant to paragraph (d)(1) of this section . . . .

Thus, ICE makes "an initial custody determination" to either detain or release the alien.

§ 1236.1(d)(1); *see also* § 1236.1(c)(8) ("Any officer authorized to issue a warrant of arrest may,

in the officer's discretion, release an alien . . . provided that the alien must demonstrate to the

satisfaction of the officer that such release would not pose a danger to property or persons, and

---

[5] This refers to a final removal order.

that the alien is likely to appear for any future proceeding."). Following this determination, the alien can "request amelioration of the conditions under which he or she may be released" in an application to an IJ. Upon receiving this application, the IJ has the power to "detain the alien in custody, release the alien, and determine the amount of bond." *Id.*; *see also* § 1003.19(a) ("Custody and bond determinations made by the service pursuant to 8 CFR part 1236 may be reviewed by an Immigration Judge pursuant to 8 CFR part 1236."); *Johnson*, 594 U.S. at 527. Finally, either the government or the alien may appeal the IJ's decision to the BIA. 8 C.F.R. § 1236.1(d)(3); § 1003.19(f).

In Mr. Kegel's case, ICE made an initial determination to detain him upon learning that his B2 visitor visa expired. Mr. Kegel then appealed ICE's decision to an IJ, and at the hearing, the IJ ordered Mr. Kegel released from custody under a bond of $5,000 as well as "no arrests, no harmful contact, no driving without a valid driver's license, [and] no illegal drugs." The government did not contest these conditions of release, nor did it appeal the IJ's decision to the BIA. Yet following Mr. Kegel's release, ICE unilaterally restricted his travel, required him to check-in with the ISAP office every eight weeks, and installed an ankle monitor on him, later replacing the ankle monitor with the SmartLINK app.

We believe ICE acted outside of its authority when it imposed these additional restraints on Mr. Kegel beyond what the IJ ordered. ICE can unquestionably set conditions of release, but the plain text of § 1236.1(d)(1) allows ICE to make only the "*initial* custody determination" (emphasis added), after which it offers an alien the chance to "request amelioration of the conditions under which he or she may be released" from an IJ. ICE lacks the authority to then unilaterally impose new release conditions on aliens, as new release conditions are not an "initial

13

custody determination" and would allow ICE to decide for itself the outcome of the appeal. As

Judge Scott cogently explained when she considered this same issue:

> A complete textual analysis of the regulations requires that they be read together, giving meaning to each section so as to avoid absurd outcomes, redundancy, and futility of certain provisions. If ICE's interpretation of the process were correct— that ICE may initially determine release conditions under 8 C.F.R. Section 1236.1(c)(8), [petitioner] may appeal those conditions to an immigration judge under 8 C.F.R. Section 1236.1(d)(1), yet ICE can thereafter impose additional release conditions notwithstanding the immigration judge's order, all while never having advocated for such conditions before the immigration judge or appealed to the BIA under Section 1236.1(d)(3)—then the administrative adjudicatory process would be rendered meaningless and superfluous.

*N- N- v. McShane*, 813 F. Supp. 3d 496, 500 (E.D. Pa. 2025); *see also Orellana Juarez*, 788 F.

Supp. at 69 ("To take the Respondents' position as true would be to render the AG's delegation

to an IJ meaningless, and would defeat the purpose of having a knowledgeable, neutral third

party review the appropriateness of a noncitizen's detention."); *Gonzalez Mojica v. Lyons*, No.

25-CV-13783-ADB, 2026 WL 266502, at *1 (D. Mass. Feb. 2, 2026) ("[T]here is nothing in the

procedural scheme that authorizes ICE to impose additional conditions following the

immigration judge's decision. ICE's only recourse following a decision not to its liking is an

appeal to the BIA."); *da Silva*, 2026 WL 45165, at *4 (D.N.J. Jan. 7, 2026) ("ICE violated its

own regulations when, instead of appealing the Immigration Court's Order to the BIA as it

should have, it imposed additional restrictions on Petitioner's supervised release.").

The government counters that only ICE — not IJs — can impose release conditions, and

therefore ICE's enrollment of Mr. Kegel in ISAP supplemented rather than contradicted the IJ's

order. DI 8 at 10-11. In support of its argument, the government cites to 8 C.F.R.

§ 1236.1(d)(1), which, as referenced above, allows IJs "to exercise the authority in [8 U.S.C.

§ 1226] . . . to detain the alien in custody, release the alien, and determine the amount of bond, if

any, under which the [alien] may be released," but does not specifically mention setting conditions of release. While this is a close issue, we disagree with the government's argument for two reasons. First, § 1226 expressly includes the power to set conditions of release, *see* § 1226(a)(2)(A), and thus the authorization of IJs to "exercise the authority in [8 U.S.C. § 1226]," § 1236.1(d)(1) carries with it the power to set conditions of release. *See also Hernandez v. Sessions*, 872 F.3d 976, 983 (9th Cir. 2017) ("If the DHS officer or IJ determines that the non-citizen does not pose a danger and is likely to appear at future proceedings, then he may release the non-citizen on bond *or other conditions of release*.") (emphasis added).

Second, the IJ in this case *did* impose conditions of release on Mr. Kegel: no arrests, no harmful contact, no driving without a valid driver's license, and no illegal drugs. The IJ's Order even contains an "other" box, allowing the IJ to set conditions of release, as shown below:

**ORDER OF THE IMMIGRATION JUDGE**

The respondent requested a custody redetermination pursuant to 8 C.F.R. § 1236. After full consideration of the evidence presented, the respondent's request for a change in custody status is hereby ordered:

☐  Denied, because

☑  Granted. It is ordered that Respondent be:
    ☐  released from custody on his own recognizance.
    ☑  released from custody under bond of $ 5,000.00
    ☑  other:
        no arrests
        no harmful contact
        no driving without a valid driver's license
        no illegal drugs
☐  Other:

DI 13 at 3. And the IJ asked the parties at Mr. Kegel's hearing if they "wish to reserve appeal . . . on the amount [of bond] *or the conditions*?" DI 13 at 8 (emphasis added). Thus, the IJ's own practices here bely the government's arguments. *See Kisor v. Wilkie,* 588 U.S. 558, 579

15

(2019) ("[W]e have stated, that a court should decline to defer to a merely convenient litigating position or post hoc rationalization advanced to defend past agency action against attack.") (citation modified). We note also that when we asked the government to provide any caselaw supporting its defense of ICE on these issues, it provided none. *See* DI 14 at 1-2.

For these reasons, we are persuaded that ICE violated its own regulations when it imposed additional conditions of release on Mr. Kegel after the IJ's order. ICE could have imposed these conditions as part of its initial custody determination after arresting Mr. Kegel or argued for these conditions to the IJ or the BIA during Mr. Kegel's appeal. But ICE cannot sidestep the process to unilaterally impose new terms of release.

## C. Remedy

"We begin with the long-settled principle that rules promulgated by a federal agency that regulate the rights and interests of others are controlling upon the agency." *Leslie v. Att'y Gen. of U.S.,* 611 F.3d 171, 175 (3d Cir. 2010). The first case where the Supreme Court applied this doctrine was in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). In *Accardi*, 347 U.S. at 261, the petitioner filed a habeas corpus action attacking the validity of the BIA's denial of his application for suspension of deportation under § 19(c) of the Immigration Act of 1917. Under the applicable regulations that supplemented § 19(c), the BIA was required to exercise discretion when ruling on suspension applications. *Id.* at 266. But the petitioner argued that the BIA had prejudged his case by relying on the fact that he was on a list of "unsavory characters" provided by the Attorney General. *Id.* at 262. Sympathetic to these arguments, the Supreme Court reversed the lower court's denial of relief and held that the petitioner was entitled to a new hearing before the BIA if he could prove these allegations in district court. *Id.* at 268.

16

In the years after *Accardi*, "the Court continued to require agencies to comply with their promulgated regulations," *Leslie*, 611 F.3d at 176 (citing *Service v. Dulles*, 354 U.S. 363 (1957); *Vitarelli v. Seaton*, 359 U.S. 535 (1959); and *Yellin v. United States*, 374 U.S. 109 (1963)), but also limited the doctrine's scope in *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532 (1970). That case concerned the Interstate Commerce Commission's (ICC's) authority to grant motor carriers temporary operating authority without hearings when there was an "immediate and urgent need" for service that existing carriers could not meet. *Id.* at 533-34. In the lead up to the case, the ICC granted American Farm Lines's (AFL's) application for temporary operating authority despite that its application lacked the exact items of information required by the regulations. *Id.* at 536-37. Protesting authorities then sought review of the ICC's actions, and the case reached the Supreme Court. *Id.* In a shift from *Accardi*, the Court sided with the agency, holding that because the ICC's rules "were not intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion" the agency could "relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it." *Id.* at 538-39. And furthermore, the Court held that in situations like these, an agency's actions are not reviewable "except upon a showing of substantial prejudice to the complaining party." *Id.* at 539.

*Am. Farm Lines* introduced some uncertainty as to when regulatory violations are so serious as to constitute reversible error without a showing of prejudice. Our Circuit developed a framework for evaluating this issue in *Leslie*, 611 F.3d at 178, holding that: "when an agency promulgates a regulation protecting fundamental statutory or constitutional rights of parties appearing before it, the agency must comply with that regulation. Failure to comply will merit

17

invalidation of the challenged agency action without regard to whether the alleged violation has substantially prejudiced the complaining party." And then in *Aquino v. Att'y Gen.,* 53 F.4th 761, 766 (3d Cir. 2022), the Third Circuit clarified the meaning of a "fundamental right," writing that "for a regulation to protect a fundamental right, a violation must be a structural error that necessarily makes proceedings fundamentally unfair."

In *Leslie*, Mr. Leslie petitioned for review of his final order of removal, arguing that the IJ failed to advise him of the availability of free legal services as required under 8 C.F.R. § 1240.10(a)(2)-(3). *Leslie*, 611 F.3d at 173. The Court agreed with Mr. Leslie that the Agency violated this regulation, and then found that Mr. Leslie did not have to make a showing of prejudice to win relief because § 1240.10(a)(2)-(3) protects both a fundamental statutory and constitutional right. Statutorily, the regulation derives from 8 U.S.C. § 1362, which says that "[i]n any removal proceedings before an immigration judge . . . the person concerned shall have the privilege of being represented . . . by such counsel, authorized to practice in such proceedings, as he shall choose." Constitutionally, the regulation derives from the Fifth Amendment due process right to a fundamentally fair hearing, because it helps ensure that the alien can reasonably present his case. *Id.* at 180-81.

Here, we are persuaded that, like in *Leslie*, ICE violated a regulation — 8 C.F.R. § 1236.1(d) — that protects Mr. Kegel's Fifth Amendment due process rights, and therefore the agency's action must be vacated, regardless of whether Mr. Kegel can demonstrate substantial prejudice. The Fifth Amendment forbids the government from "depriv[ing] [people] of life, liberty, or property, without due process of law." These protections apply "to all persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or

18

permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (citation modified).

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation modified). Title 8 C.F.R. § 1236.1(d) safeguards this right for aliens who are detained pending their removal proceedings by providing them with an opportunity to contest ICE's custody determinations in a hearing before an IJ. *See German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 209 (3d Cir. 2020) ("[D]ue process requires the Government to justify continued detention at a bond hearing."). But ICE's failure to follow this regulation hampered Mr. Kegel's opportunity to meaningfully advocate for his liberty at the hearing, because he persuaded an IJ to release him from detention with limited conditions only for ICE to then unilaterally impose significant new restraints. In other words, ICE's violation of this regulation rendered Mr. Kegel's custody review proceedings "fundamentally unfair." *Aquino.,* 53 F.4th at 766; *see also N- N-*, 813 F. Supp. 3d at 502 ("ICE's failure to follow its own rules bears heavily on N- N-'s procedural rights and individual liberties. He need not make an affirmative showing of prejudice under *Accardi* . . . ."). And furthermore, even if Mr. Kegel were required to show substantial prejudice to warrant relief, he has met this bar here, for much the same reasons we discussed when concluding that he is in custody. For these reasons, ICE's additional conditions of release on Mr. Kegel beyond those imposed by the IJ are invalid under the *Accardi* doctrine.[6]

---

[6] Because we grant relief under *Accardi*, we decline to consider the merits of petitioner's other claims for relief.

19

### III.    CONCLUSION

For the reasons stated above, Mr. Kegel's habeas petition is granted.  An appropriate order follows.